UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANASTASIA GRIFFITH, ALAN WEISSMAN,            :
& MATTHEW D. WOLF,
                                              :

                         Plaintiff,           :            09 Civ. 9747 (AJP)

                                              :
            -against-                                      **OPINION AND ORDER**
                                              :
STEINER WILLIAMSBURG, LLC,
                                              :

                         Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ANDREW J. PECK, United States Magistrate Judge:**


              Plaintiffs Anastasia Griffith and Alan Weissman[1] bring this action against defendant

Steiner Williamsburg, LLC ("Steiner") for revocation of plaintiffs' agreements to purchase

condominium units at 80 Metropolitan Avenue in Brooklyn, as well as a refund of their deposits,

alleging that Steiner failed to comply with the requirements of the Interstate Land Sales Full

Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701-20.  (See Dkt. No. 1: Comp. ¶¶ 1-3, 76-80.)  Steiner's

counterclaims assert that plaintiffs anticipatorily breached the agreements by refusing to close title

on the units, entitling Steiner to retain plaintiffs' deposits and be reimbursed for its attorneys' fees

incurred in this action.  (See Dkt. No. 5: Ans. ¶¶ 90-109.)


---

[1]        The parties have settled the claims and counterclaims relating to plaintiff Matthew D. Wolf.
           (Dkt. No. 17: Pls. Br. at 1 n.1; Dkt. No. 20: Steiner Br. at 1 n.1; Dkt. No. 23: Steiner Reply
           Br. at 2 n.1.)

H:\OPIN\GRIFFITH

2

Presently before the Court are the parties' cross-motions for summary judgment. (Dkt. No. 15: Pls. Notice of Motion; Dkt. No. 18: Steiner Notice of Motion).  The parties have consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 9.)

For the reasons set forth below, plaintiffs' motion for summary judgment is GRANTED and Steiner's summary judgment motion is DENIED.

## FACTS

Steiner is the sponsor of the condominium development located at 80 Metropolitan Avenue, Brooklyn (the "Condominium").  (Dkt. No. 16: Pls. Rule 56.1 Stmt. ¶ 1; Dkt. No. 19: D. Steiner Aff. ¶ 3; Dkt. No. 22: Steiner Rule 56.1 Stmt. ¶ 2.)  The "Condominium Offering Plan" filed with the New York State Attorney General on August 21, 2007 describes the Condominium as 114 tower units, 9 townhouse units, 24 cabanas, 53 parking spaces and 8 storage rooms.  (Pls. Rule 56.1 Stmt. ¶¶ 6-7, 11 & Ex. B: Condominium Offering Plan; D. Steiner Aff. ¶¶ 3-4; Steiner Rule 56.1 Stmt. ¶¶ 3-4.)  Steiner advertised, marketed and/or sold the Condominium through the mail and in interstate commerce.  (Pls. Rule 56.1 Stmt. ¶¶ 16-23 & Exs. C & D: Steiner Response to Request for Admissions ["RFAs"] ¶¶ 6-14.)

On November 7, 2007, plaintiff Griffith signed a purchase agreement to buy unit 3B in the Condominium and gave a $57,500 deposit.  (Dkt. No. 1: Compl. ¶¶ 17-18 & Ex. A: Griffith Purchase Agreement; Pls. Rule 56.1 Stmt. ¶ 2.)[2/]  Also on November 7, 2007, plaintiff Weissman

---

[2/]    Steiner's Rule 56.1 Statement does not address Griffith's claims as those claims had been "conditionally resolved" at the time of its filing.  (Pls. Rule 56.1 Stmt. at 1 n.1; Dkt. No. 17: (continued...)

signed a purchase agreement to buy unit 3H and parking space P10, paying a $95,500 deposit. (Compl. ¶¶ 19-20 & Ex. B: Weissman Purchase Agreement; Pls. Rule 56.1 Stmt. ¶ 4; D. Steiner Aff. ¶ 10; Steiner Rule 56.1 Stmt. ¶¶ 8-9.)  Under the terms of both Purchase Agreements, the deposits were held in escrow and would serve as "liquidated damages" in the event of plaintiffs' default. (Purchase Agreements ¶ 5; D. Steiner Aff. ¶ 10; Steiner Rule 56.1 Stmt. ¶¶ 9-10.)

When plaintiffs purchased the units, the Condominium was still under construction and Steiner had not yet obtained a certificate of occupancy for any of the units.  (Compl. ¶¶ 44, 46; Dkt. No. 5: Ans. ¶¶ 44, 46; Pls. Rule 56.1 Stmt. ¶¶ 31, 34.)

As discussed on pages 10-12 below, ILSA applies to the sale of condominium units and provides that:

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

15 U.S.C. § 1703(c).

As of the date of plaintiffs' purchases, Steiner had not given plaintiffs a property report relating to the Condominium and had not filed a statement of record with the United States Department of Housing and Urban Development ("HUD").  (Pls. Rule 56.1 Stmt. ¶¶ 24-27 & Exs.

---

[2/]    (...continued)
Pls. Br. at 1 n.1; Dkt. No. 20: Steiner Br. at 1 n.1; Dkt. No. 27: Pls. Opp. Rule 56.1 Stmt. ¶ 8.)  Griffith's claims, however, were not resolved (Dkt. No. 23: Steiner Reply Br. at 2 n.1; Dkt. No. 24: Pls. Reply Br. at 1 n.1), and Steiner's arguments in its briefs and moving papers "apply with equal force to Ms. Griffith."  (Steiner Reply Br. at 2 n.1.)

4

C & D: Steiner Response to RFAs ¶¶ 15-18.)[3/]   Additionally, the Purchase Agreements did not

contain a provision notifying the plaintiffs that, if they did not "receive a Property Report prepared

pursuant to the rules and regulations of the Office of Interstate Land Sales Registration, [HUD], in

advance of [their] signing the contract or agreement, the contract or agreement of sale may be

cancelled at [their] option for two years from the date of signing." (Pls. Rule 56.1 Stmt. ¶ 29 & Exs.

C & D: Steiner Response to RFAs ¶ 38.)

On September 30, 2009, Weissman notified Steiner that he was revoking his purchase

agreement and requesting his deposit back due to Steiner's failure to comply with ILSA. (Pls. Rule

56.1 Stmt. ¶ 44; D. Steiner Aff. ¶ 13; Steiner Rule 56.1 Stmt. ¶ 23.)   Steiner never formally

responded to Weissman's notification letter. (Pls. Rule 56.1 Stmt. ¶ 46.)   On October 23, 2009,

Griffith notified Steiner that she was revoking her purchase agreement and requesting her deposit

back due to Steiner's failure to comply with ILSA. (Pls. Rule 56.1 Stmt. ¶ 43.)[4/]   On November 5,

_____

[3/]   Steiner's responses to the RFAs were for the consolidated action of Alexander v. Steiner
Williamsburg, LLC, 09 Civ. 6735, which has since settled. Douglas Steiner, the managing
member and decision maker for Steiner and in charge of the Condominium project (Pls.
Rule 56.1 Stmt. ¶¶ 47-49 & Ex. A: D. Steiner Dep. at 76, 123; D. Steiner Aff. ¶ 1), stated in his
deposition that Steiner's RFA responses also applied to plaintiffs' November 7, 2007
purchase (D. Steiner Dep. at 99-101).

[4/]   Steiner alleges that plaintiffs' revocation requests were "a classic case of buyer's remorse,"
because "the market has corrected," i.e., crashed, from the boom market in existence at the
time of the purchases. (See Steiner Br. at 1.) As plaintiffs correctly respond, "a purchaser's
reasons for rescinding a purchase contract are not relevant under ILSA." (Pls. Reply Br. at
8-9.) See Piggott v. Sanibel Dev., LLC, 576 F. Supp. 2d 1258, 1264 n.15 (S.D. Ala. 2008)
("Under the plain terms of [ILSA], if the Project is not exempt, then [developer's] failure to
furnish a property report conferred upon plaintiffs an absolute right to back out of the
transactions (for good reasons, bad reasons or no reasons) at any time within a two-year
period. Whether the plaintiffs had a morally defensible reason for rescinding is simply not
for this Court to decide.") (citation omitted).

2009, Steiner responded to Griffith, stating that the Condominium was "exempt from ILSA and there is no ILSA violation." (Compl. ¶¶ 34-35 & Ex. G: 11/5/09 Steiner Letter to Griffith; Pls. Rule 56.1 Stmt. ¶ 45.)

Douglas Steiner, Steiner's managing member (see page 4 n.3 above), first learned of ILSA in December 2007 (Pls. Rule 56.1 Stmt. ¶ 50 & Ex. A: D. Steiner Dep. at 187).  In order to obtain financing for the Condominium, Steiner was required to demonstrate its compliance with ILSA.  (Steiner Rule 56.1 Stmt. ¶ 7; Pls. Opp. Rule 56.1 Stmt. ¶ 7.)  In a December 3, 2007 letter to its lender, Steiner stated its intent to utilize two ILSA exemptions:

> To our knowledge, the marketing and sale of lots of the Condominium by Borrower [i.e., Steiner] in the manner presently contemplated by Borrower will not conflict with and will satisfy [ILSA] . . . .  To our knowledge, Borrower will meet all of the exemption criteria set forth in the relevant sections of [ILSA] and qualifies for a combination of exemptions that would exempt Borrower from the filing requirements of [ILSA]. The first ninety nine (99) lots sold will be exempt pursuant to Section 1702(b) of [ILSA].  The remaining lots in excess of the ninety nine (99) will be exempt under Section 1702(a)(2).

(Dkt. No. 21: Roschelle Aff. Ex. D: 12/3/07 Steiner Letter to Wachovia Bank ¶ 8; Pls. Rule 56.1 Stmt. ¶ 54; D. Steiner Aff. ¶ 7; Steiner Rule 56.1 Stmt. ¶ 7; Pls. Opp. Rule 56.1 Stmt. ¶ 7.)

Steiner has not yet sold ninety-nine units in the Condominium. (D. Steiner Aff. ¶ 11; Steiner Rule 56.1 Stmt. ¶ 22; Pls. Opp. Rule 56.1 Stmt. at 2.)  Steiner obtained temporary certificates of occupancy ("TCO") for the completed units on March 11, 2010.  (Roschelle Aff. Ex. G: Certificates of Occupancy; D. Steiner Aff. ¶ 11; Steiner Rule 56.1 Stmt. ¶ 17; Pls. Opp. Rule 56.1 Stmt. at 2.)

**The Parties' Motions**

Plaintiffs' summary judgment motion claims that:

[T]here is no dispute that [ILSA] . . . applies to the Condominium, that Defendant [Steiner] has not complied with any of the requirements of ILSA, and that Plaintiffs exercised their statutory rights of revocation within the applicable two-year statute of limitations. Plaintiffs are, therefore, entitled to judgment as a matter of law unless Defendant [Steiner] can meet its burden of demonstrating that the Condominium falls within ILSA exemptions that were not selected by Defendant [Steiner] "for the purpose of evasion."

. . . [Steiner's] claimed exemptions are inapplicable as a matter of law because they did not exist on the date the purchase agreements in issue were entered into.

(Dkt. No. 17: Pls. Br. at 1-2.)[5/]

Steiner cross-moved for summary judgment, arguing that the Condominium was exempt from ILSA's requirements under the "100-lot" and "improved lot" exemptions, even if these exemptions were not "in place at the time" of plaintiffs' Purchase Agreements. (Dkt. No. 20: Steiner Br. at 2-3.) Steiner also seeks summary judgment on its counterclaims that plaintiffs anticipatorily breached the Purchase Agreements, that Steiner thus may retain plaintiffs' deposits as "liquidated damages" and that Steiner also is entitled to "reimbursement of all costs and expenses incurred in connection with plaintiff[s'] default, including counsel fees." (Steiner Br. at 2, 18-19.)[6/]

---

[5/]   Plaintiffs allege that, in addition to failing to provide timely disclosure of the property report, Steiner also failed to comply with several other ILSA registration and disclosure provisions. (Pls. Br. at 7-8.) Since plaintiffs would be entitled to revoke their Purchase Agreements solely based on Steiner's failure to provide the property report (see 15 U.S.C. § 1703(c)), this Court need not address the other alleged ILSA violations.

[6/]   The Purchase Agreements obligate plaintiffs to reimburse Steiner's legal fees and disbursements incurred in defending Steiner's "rights under this Agreement or, in the event Purchaser defaults under this Agreement beyond any applicable grace period, in cancelling (continued...)

**ANALYSIS**

I.   **SUMMARY JUDGMENT STANDARD**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary "judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Instead, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

---

[6]/   (...continued)
this Agreement or otherwise enforcing Purchaser's obligations hereunder." (Purchase Agreements ¶ 30; D. Steiner Aff. ¶ 15; Steiner Rule 56.1 Stmt. ¶ 25.)

8

56(e);  accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct.

at 1356; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment,

"[t]he time has come . . . 'to put up or shut up.'") (citations omitted), cert. denied, 540 U.S. 811, 124

S. Ct. 53 (2003).

   In evaluating the record to determine whether there is a genuine issue as to any

material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[7/]

The Court draws all inferences in favor of the nonmoving party only after determining that such

inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v.

DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to

the issue on which summary judgment is sought, there is any evidence in the record from any source

from which a reasonable inference could be drawn in favor of the nonmoving party, summary

judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

   In considering a motion for summary judgment, the Court is not to resolve contested

issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See,

e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v.

U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).

To evaluate a fact's materiality, the substantive law determines which facts are critical and which

facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

---

[7/]  See also, e.g., Feingold v. N.Y., 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy
Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at
1223.

9

While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . .  Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't. Inc., 249 F.3d 115, 121 (2d  Cir. 2001) (citation omitted).[8/]

## II.   THE CONDOMINIUM IS NOT EXEMPT FROM ILSA AND THUS PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT

### A.   Background:  The Passage of ILSA and Judicial Interpretations

ILSA was enacted as part of the Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title XIV, 82 Stat. 476, 590 (1968), and amended in 1979, Pub L. No. 96-153, Title

---

[8/]   Accord, e.g., Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010); Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 492 F.3d 89, 96 (2d Cir. 2007); Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988); Eastman Mach. Co. v. United States, 841 F.2d 469, 473-74 (2d Cir. 1988); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., 618 F. Supp. 2d 280, 291 (S.D.N.Y. 2009); Alfano v. CIGNA Life Ins. Co., 07 Civ. 9661, 2009 WL 222351 at *13 (S.D.N.Y. Jan. 30, 2009) (Lynch, D.J.); United States S.E.C. v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006); Donoghue v. Casual Male Retail Group, Inc., 375 F. Supp. 2d 226, 230 (S.D.N.Y. 2005); Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus., No. 00 CV 2013, 2004 WL 2851792 at *7 (E.D.N.Y. Dec. 8, 2004); Revlon Consumer Prods. Corp. v. Estee Lauder Cos., 00 Civ. 5960, 2003 WL 21751833 at *7 (S.D.N.Y. July 30, 2003) (Peck, M.J.).

IV, 93 Stat. 1101, 1122 (1979).  ILSA was "designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers."  Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 778, 96 S. Ct. 2430, 2433 (1976).[9/]

ILSA applies to "subdivision[s]," defined as "any land which is located in any State . . . and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."  15 U.S.C. § 1701(3).[10/]  "While the ILSA's text refers to the sale of 'lots,' . . . its protections apply to the sale of condominiums as well."  Cruz v. Leviev Fulton Club, LLC, 711 F. Supp. 2d 329, 331 (S.D.N.Y. 2010) (citing cases); see also, e.g., Winter v. Hollingsworth Props., Inc., 777 F.2d at 1448 & n.10 (applying ILSA to condominiums "is a reasonable interpretation of Congress' original intent in enacting the statute and the only defensible interpretation . . . .") (citing cases); Bacolitsas v. 86th & 3rd Owner, LLC, 09

---

[9/]    See also, e.g., Long v. Merrifield Town Ctr. Ltd. P'ship, 611 F.3d 240, 244 (4th Cir. 2010) (ILSA "is a remedial statute enacted to prevent interstate land fraud and to protect unsuspecting and ill-informed investors from buying undesirable land."); Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1447 (11th Cir. 1985) ("It is not disputed that Congress, in passing the statute, desired to protect purchasers from unscrupulous sales of undeveloped home sites, frequently involving out-of-state sales of land purportedly suitable for development but actually under water or useful only for grazing.").

[10/]    "[C]ommon promotional plan" is defined as

a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.

15 U.S.C. § 1701(4).

Civ. 7158, 2010 WL 3734088 at *4 (S.D.N.Y. Sept. 21, 2010) ("Though the text of ILSA employs the term 'lots' throughout, . . . the statute also governs condominium units."); An v. Leviev Fulton Club, LLC, 09 Civ. 1937, 09 Civ. 3537, 09 Civ. 4706, 2010 WL 3291402 at *1 (S.D.N.Y. Aug. 10, 2010); Bodansky v. Fifth on the Park Condo, LLC, 09 Civ. 4651, 09 Civ. 6433, 2010 WL 334985 at *9 n.6 (S.D.N.Y. Jan. 29, 2010); Grove Towers, Inc. v. Lopez, 467 So. 2d 358, 360 n.3 (Fla. Dist. Ct. App.) ("This court, following the lead of other courts, has applied ILSA to sales of condominium units.") (citing cases), appeal denied, 480 So. 2d 1294 (1985).

Unless exempt, a developer must comply with ILSA's registration and disclosure provisions prior to any sale:

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails--

(1) with respect to the sale or lease of any lot not exempt under section 1702 of this title--

(A) to sell or lease any lot unless a statement of record with respect to such lot is in effect . . . ;

(B) to sell or lease any lot unless a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee.

15 U.S.C. § 1703(a)(1)(A)-(B).  A "property report" is prepared by the developer and contains "a condensed version of the statement of record filed with HUD," including a legal description of the property, information about the title to the land, and other required disclosures.  Bodansky v. Fifth on the Park Condo, LLC, 2010 WL 334985 at *3; see 15 U.S.C. §§ 1705(1)-(12), 1707(a).

If the developer fails to deliver the required property report before the purchaser signs the purchase agreement, the sale "may be revoked at the option of the purchaser . . . within two years from the date of such signing," and the purchaser is entitled to a refund of all monies paid by the purchaser under the contract. 15 U.S.C. § 1703(c), (e).  The language of the purchase agreement must include the purchaser's revocation right.  15 U.S.C. § 1703(c).[11/]

There are two types of ILSA exemptions: (1) full exemptions, listed in 15 U.S.C. § 1702(a), which relieve a developer from all of ILSA's provisions; and (2) partial exemptions, listed in 15 U.S.C. § 1702(b), which relieve a developer of ILSA's registration and disclosure requirements, but not its anti-fraud provisions.

In the present case, Steiner asserts that the Condominium was exempt from ILSA's registration and disclosure requirements based on the 100 lot exemption in 15 U.S.C. § 1702(b)(1). (See Dkt. No. 20: Steiner Br. at 2, 4, 7-8, 10-11; Dkt. No. 23: Steiner Reply Br. at 2-3.) Section 1702(b)(1) provides that:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions requiring registration and disclosure . . . shall not apply to --
>
> (1) the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section.

15 U.S.C. § 1702(b)(1).  Since the Condominium contained 123 units (see page 2 above), this exemption would apply only if at least 24 units were exempt under 15 U.S.C. § 1702(a).  For this, Steiner relies on the improved lot exemption:

---

[11/]   ILSA also provides that a purchaser "may bring an action at law or in equity" to enforce this right of revocation.  15 U.S.C. § 1709(b).

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to --
>
> . . . .
>
> (2) the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building . . . .

15 U.S.C.§ 1702(a)(2).  Steiner argues that because it did not sell ninety-nine units before obtaining a temporary certificate of occupancy for all the units, and because all the unsold units now qualify for the improved lot exemption, the 100 lot exemption applies.  (Steiner Br. at 2-3, 7-8, 11; Steiner Reply Br. at 2-3.)

While ILSA allows a developer to "stack" exemptions, see 15 U.S.C. § 1702(a)-(b), plaintiffs contend that Steiner's "compliance with ILSA is measured at the time that the plaintiff signed the contract, not at some later date." (Dkt. No. 17: Pls. Br. at 10.)  Plaintiffs argue that Steiner should not be allowed to sell lots without complying with ILSA only "to come into compliance at some later date by creating an exemption for future sales of units that, at the time of the Purchase Agreement, fell within the common promotional plan."  (Pls. Br. at 11.)

This case boils down to a question of law, i.e., of statutory construction: is the availability of the 100 lot exemption determined at the time the purchaser signed the purchase agreement, or can the developer rely on the exemption until the 100th non-exempt lot is sold?

Most courts that have faced this issue have ruled that the availability of the 100 lot exemption is determined when the purchaser signs the purchase agreement.  E.g., First Global Corp. v. Mansiana Ocean Residences, LLC, No. 09-21092-Civ., 2010 WL 2163756 at *4 (S.D. Fla. May 27, 2010) ("For purposes of the 100-lot exemption, the relevant number is the number of units

communicated by the developer to the buyer and the purchasing public" and the developer was not

entitled to the 100 lot exemption because, "at the time that [the purchaser] contracted to purchase

its unit, the only information communicated to [the purchaser], and to the public at-large, was that

the [condominium] would consist of 135 units."); Rensin v. Juno-Loudon, LLC, No. 09cv1391, 2010

WL 1381546 at *7 (E.D. Va. Mar. 30, 2010) ("When determining whether or not the subdivision

is one 'containing fewer than one hundred units,' the number of nonexempt lots in the subdivision

should be determined contemporaneously with when the purchaser enters into the purchase

agreement for the lot in the subdivision."); Nahigian v. Juno-Loudon, LLC, No. 09cv725, 2010 WL

1381637 at *7 (E.D. Va. Mar. 30, 2010) (same); 200 East Partners, LLC. v. Gold, 997 So. 2d 466,

469 (Fla. Dist. Ct. App. 2008) ("This court finds that because [the developer] failed to perfect an

exemption for all units of the 115 lot project prior to the [purchasers] executing their purchase and

sale agreement, [the developer] violated ILSA by failing to provide the [purchasers] with a printed

property report."); Grove Towers, Inc. v. Lopez, 467 So. 2d at 361 (Developer was not entitled to

the 100 lot exemption since "[a]t the time [purchasers] signed the purchase and sale agreement . . . ,

they were given condominium documents (disclosure statement and declaration of condominium,

among others) which stated that [the] Condominium would consist of a total of 108 units.") (fn.

omitted).

        Two district courts in this Circuit, however, have ruled that a developer is entitled

to the 100 lot exemption as long as no more than 99 non-exempt lots are sold.  Bodansky v. Fifth

on the Park Condo, LLC,  2010 WL 334985 at *4 ("Thus, the Hundred Lot Exemption can still apply

to a subdivision containing one hundred or more lots as long as all lots sold above the ninety-nine

non-exempt lots maximum will be covered by a § 1702(a) exemption."); Romero v. Borden E. River Realty LLC, No. 09-CV-665, Mar. 16, 2010 N.Y. L.J. 25 col. 3 (E.D.N.Y. Mar. 11, 2010) (following Bodansky).[12/]

B.     **The Availability of the 100 Lot Exemption is Determined at the Time the Purchaser Signs the Purchase Agreement**

"'Statutory interpretation always begins with the plain language of the statute,' which [the court] consider[s] in 'the specific context in which that language is used, and the broader context of the statute as a whole.'"   ASM Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 582 F.3d 422, 427 (2d Cir. 2009) (citations omitted), cert. denied, 130 S. Ct. 1527 (2010); see, e.g., In re Application of N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials, 577 F.3d 401, 406 (2d Cir. 2009) (In construing statutes, a court should "examine the text of the statute itself, interpreting provisions in light of their ordinary meaning and their contextual setting.").   "'To ascertain Congress's intent, we begin with the statutory text because if its language is unambiguous, no further inquiry is necessary.'"   Clark v. Astrue, 602 F.3d 140, 147 (2d Cir. 2010);   see also, e.g., Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) ("'[S]tatutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there.'") (citations omitted); United States v. Hasan, 586 F.3d 161, 167 (2d Cir. 2009) ("'Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'"), cert. denied, 131 S. Ct. 317 (2010); Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d 210, 216

---

[12/]     Bodansky and Romero are currently on appeal to the Second Circuit.

(2d Cir. 2008) ("'When a statute's language is clear, our only role is to enforce that language 'according to its terms.'"").

The Court must "interpret a statute as it is, not as it might be, since 'courts must presume that a legislature says in a statute what it means and means in a statute what it says . . . .'" Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d at 216 (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149 (1992)); see, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296, 126 S. Ct. 2455, 2459 (2006) ("When the statutory 'language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'"). "A statute's clear language does not morph into something more just because courts think it makes sense for it to do so." Life Receivables Trust v. Syndicate 102 at Lloyd's of London, 549 F.3d at 217.

"The disclosure requirements of the Land Sales Act [i.e., ILSA] are designed to prevent fraud in interstate land transactions, and the Act should be liberally construed in favor of broad coverage to effectuate its remedial purpose." De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co., 608 F.2d 1297, 1302 (9th Cir. 1979).[13/] ILSA's exemptions, on the other hand, should be narrowly construed. See, e.g., Long v. Merrifield Town Ctr. Ltd. P'ship, 611 F.3d 240, 245 (4th Cir. 2010) ("Because [ILSA] is a remedial statute, however, we construe its exemptions narrowly.");

---

[13/]    See, e.g., Dalzell v. Trailhead Lodge at Wildhorse Meadows, LLC, No. 09-cv-02614, 2010 WL 3843464 at *2 (D. Colo. Sept. 27, 2010) ("In light of its remedial objectives, ILSA must be construed in favor of broad coverage."); cf., e.g., Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S. Ct. 548, 553 (1967) ("In addition, we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.").

Olsen v. Lake Country, Inc., 955 F.2d 203, 206 (4th Cir. 1991) (As a remedial statute, ILSA's exemptions "are to be construed narrowly"), cert. denied, 503 U.S. 972, 112 S. Ct. 1587 (1992); Markowitz v. Ne. Land Co., 906 F.2d 100, 105 (3d Cir. 1990) ("[T]he general rule of statutory construction [is] that exemptions from remedial statutes such as [ILSA] are to be narrowly construed."); An v. Leviev Fulton Club, LLC, 09 Civ. 1937, 09 Civ. 3537, 09 Civ. 4706, 2010 WL 3291402 at *1 (S.D.N.Y. Aug. 10, 2010) ("As such, condominium sales are within the scope of the statute and the protections of [ILSA] are to be construed broadly, while the exemptions are to be construed narrowly.").

The plain language of the 100 lot exemption states that ILSA's registration and disclosure requirements do not apply to the "sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section." 15 U.S.C. § 1702(b)(1) (emphasis added). "For the purposes of [ILSA] the 'sale' takes place at the time the purchaser signs the contract and incurs an obligation." Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1449 (11th Cir. 1985); see also, e.g., Markowitz v. Ne. Land Co., 906 F.2d at 104 ("We agree with the other circuits that have examined the issue that for purposes of the Act the sale occurs when the purchaser signs the sale agreement and incurs an obligation.").

It is a well settled rule of statutory construction that "Congress' use of a verb tense is significant in construing statutes." United States v. Wilson, 503 U.S. 329, 333, 112 S. Ct. 1351, 1354 (1992).[14]/ Consequently, because the 100 lot exemption was drafted in the present tense, it

---

[14]/   Accord, e.g., Dobrova v. Holder, 607 F.3d at 301; Barscz v. Dir., Office of Workers' Comp. Programs, 486 F.3d 744, 750 (2d Cir. 2007).

18

should apply only to subdivisions that, at the time the purchaser signs the contract, contain less than 100 lots that currently are exempt under 15 U.S.C. § 1702(a), not subdivisions that will, at some time in the future, fit the parameters of the exemption.  See Rensin v. Juno-Loudon, LLC, No. 09cv1391, 2010 WL 1381546 at *5 (E.D. Va. Mar. 30, 2010) ("The statute is drafted in the present tense. A Development will be exempt from [ILSA]'s disclosure and reporting requirements if it is a 'subdivision containing' fewer than one hundred lots which are currently exempt under § 1702 subsection (a).").

Determining the availability of the exemption at the time of the sale is consistent with ILSA's purposes.  "Congress designed [ILSA] to protect purchasers of land and to prohibit fraud in land sales by requiring sellers of land, inter alia, to make certain disclosures in advance of a purchaser's signing the sales contract."  Ahn v. Merrifield Town Ctr. Ltd. P'ship, 584 F. Supp. 2d 848, 853 (E.D. Va. 2008); see, e.g., Long v. Merrifield Town Ctr. Ltd. P'ship, 611 F.3d at 245 ("These [ILSA] disclosure requirements are designed to protect purchasers by ensuring that 'prior to purchasing certain types of real estate, a buyer [is] apprised of the information needed to insure an informed decision.'"); Markowitz v. Ne. Land Co., 906 F.2d at 103 ("'[T]he Interstate Land Sales Full Disclosure Act, . . . as its title suggests, was enacted to insure that, prior to purchasing certain types of real estate, a buyer would be apprised of the information needed to insure an informed decision.'"); Grove Towers, Inc. v. Lopez, 467 So. 2d 358, 361 (Fla. Dist. Ct. App.) ("Since the purpose of the act is to protect purchasers against fraudulent land sales schemes, it is only reasonable that the statute require full disclosure before the purchasers sign a contract.") (citation & fn. omitted), appeal denied, 480 So. 2d 1294 (1985).

H:\OPIN\GRIFFITH

To achieve its purpose, ILSA's registration and disclosure provisions impose duties that a developer must comply with before the purchaser signs the purchase agreement:  The developer must file a "statement of record" with HUD (15 U.S.C. §§ 1703(a)(1)(A), 1704-06), must furnish a printed "property report" to the purchaser (15 U.S.C. §§ 1703(a)(1)(B), 1707), and may not advertise or promote the property to prospective purchasers with information that is inconsistent with the information in the property report (15 U.S.C. § 1703(a)(1)(D)). "All of these strictures are imposed prior to the sale of any lot to purchaser and are designed to provide purchaser with the critical information necessary to his decision to enter into a purchase agreement."  Rensin v. Juno-Loudon, LLC, 2010 WL 1381546 at *6.

Additionally, ILSA requires that the purchase agreement itself must notify a purchaser of his rights under ILSA.  For example, the purchase agreement must "clearly" state that if the developer fails to timely provide the purchaser with the required property report, the purchaser has the right to revoke the agreement within two years of signing the agreement.  See 15 U.S.C. § 1703(c); see also 15 U.S.C. § 1703(b), (d)(1)-(3) (providing other information about revocation rights that must be contained in the purchase agreement).

Thus, ILSA's registration and disclosure provisions make clear that Congress was trying to protect the purchaser at the time of the sale by providing the purchaser with the facts and rights necessary to make an informed decision before incurring obligations under the purchase agreement.  See, e.g., Rensin v. Juno-Loudon, LLC, 2010 WL 1381546 at *7 ("Congress designed [ILSA]'s disclosure and reporting requirements, and the right of a potential purchaser to be made aware of these disclosures and their rights of revocation, to take effect prior to and at the time of the

signing of a purchase agreement."); <u>Ahn</u> v. <u>Merrifield Town Ctr. Ltd. P'ship</u>, 584 F. Supp. 2d at 854-55 (ILSA's disclosure provisions "reflect Congress's recognition that the need for buyer protection is critical prior to the time the buyer makes the decision to sign and incur obligations . . . ."); <u>Grove Towers, Inc.</u> v. <u>Lopez</u>, 467 So. 2d at 361 ("[I]t is clear that, unless exempt . . . , [developer] was obligated to comply with ILSA's registration and disclosure requirements before [purchaser] signed the purchase and sale agreement.").

Moreover, the availability of the improved lot and "two year" exemptions under 15 U.S.C. § 1702(a)(2)[15/] are determined at the time the purchaser signs the purchase agreement.  <u>See</u>, <u>e.g.</u>, <u>Winter</u> v. <u>Hollingsworth Props., Inc.</u>, 777 F.2d at 1450 ("If at the time the purchaser signs the contract there exists a condominium building or the seller is obligated to erect such a building within two years, the sale is exempt from the Act. If, as in this case, no building exists at the time of contracting and the contract does not contain a binding obligation to complete one within two years, compliance with the statute is required."); <u>see also</u>, <u>e.g.</u>, <u>Long</u> v. <u>Merrifield Town Ctr. Ltd. P'ship</u>, 611 F.3d at 242, 245-46 ("We hold that to qualify for the Improved Lot Exemption under § 1702(a)(2) . . . the sales contract must obligate the seller to build and deliver the required structure

---

[15/]    These exemptions are defined as follows:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to . . .
>
> (2) the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years.

15 U.S.C. § 1702(a)(2).

within two years of the date that the <u>purchaser signs</u> the contract and incurs obligations . . . ."); <u>Ahn</u> v. <u>Merrifield Town Ctr. Ltd. P'ship</u>, 584 F. Supp. 2d at 854 ("[T]he sales contracts here in issue do not merit exemption from [ILSA] because the promise to build within two years is specified to run from the date the seller chooses to ratify the contract, rather than the date the buyer signs and incurs obligations.") (fn. omitted).

Given that ILSA's registration and disclosure provisions focus on the time the sale occurs – that is, when the purchaser signs the purchase agreement – the exemptions also should depend on this point in time.  See <u>Rensin</u> v. <u>Juno-Loudon, LLC</u>, 2010 WL 1381546 at *7 ("It follows that if the duties and rights imposed by the Act vest prior to (or contemporaneously with) entering into a purchase agreement, the specifically delineated exemptions should also be examined at the time the parties enter into the purchase agreement."); <u>see also</u> <u>First Global Corp.</u> v. <u>Mansiana Ocean Residences, LLC</u>, No. 09-21092-Civ., 2010 WL 2163756 at *2 (S.D. Fla. May 27, 2010) (ILSA "is a remedial statute intended to protect consumers from unscrupulous sales practices . . . . [I]n this respect, the time for determining whether a particular project or unit is entitled to one of the statutory exemptions of the ILSA is when the buyer purchases the unit.").

In determining whether the 100 lot exemption applies here, this Court will consider how many non-exempt lots the developer publicly was offering to sell at the time plaintiffs entered into their Purchase Agreements.  See, <u>e.g.</u>, <u>Long</u> v. <u>Merrifield Town Ctr. Ltd. P'ship</u>, 611 F.3d at 248 (Where purchase agreements did not satisfy the two year exemption, "the 100 Lot Exemption also could not have applied to the plaintiffs' contracts because there were more than 100 <u>non-exempt</u> units."); <u>First Global Corp.</u> v. <u>Mansiana Ocean Residences, LLC</u>, 2010 WL 2163756 at *4 ("For

purposes of the 100-lot exemption, the relevant number is the number of units communicated by the developer to the buyer and the purchasing public" and the developer was not entitled to the 100 lot exemption because "at the time that [the purchaser] contracted to purchase its unit, the only information communicated to [the purchaser], and to the public at-large, was that the [condominium] would consist of 135 units."); Rensin v. Juno-Loudon, LLC, 2010 WL 1381546 at *7 ("When determining whether or not the subdivision is one 'containing fewer than one hundred units,' the number of nonexempt lots in the subdivision should be determined contemporaneously with when the purchaser enters into the purchase agreement for the lot in the subdivision."); Grove Towers, Inc. v. Lopez, 467 So. 2d at 361 (Even though the condominium contained only 98 units when it was completed, the developer was not entitled to the 100 lot exemption since "[a]t the time [the purchasers] signed the purchase and sale agreement . . . , they were given condominium documents (disclosure statement and declaration of condominium, among others) which stated that [the] Condominium would consist of a total of 108 units.") (fn. omitted).

         When plaintiffs Griffith and Weissman signed their Purchase Agreements, the Condominium was publicly announced as consisting of 123 units.   (See pages 2-3 above.) Therefore, the Condominium was not exempt from ILSA's registration and disclosure provisions under the 100 lot exemption unless 24 units were exempt at that time.  In order to exempt these units, Steiner relies on the improved lot exemption since these units now have temporary certificates of occupancy. (See pages 12-13 above.)  At the time of plaintiffs' Purchase Agreements, however, the Condominium was under construction and none of the units had a TCO.  (See page 3 above.) Because there were more than 99 non-exempt lots at the time of plaintiffs' Purchase Agreements,

Steiner is not entitled to the 100 lot exemption.[16]   Steiner failed to provide the plaintiffs with a property report before they signed their Purchase Agreements (see pages 3-4 above), thereby violating ILSA and entitling plaintiffs to revoke their Purchase Agreements.

### C.   This Court Respectfully Disagrees With Judge Cote's Bodansky Decision

Steiner urges this Court to follow Judge Cote's decision in Bodansky v. Fifth on the Park Condo, LLC, 09 Civ. 4651, 09 Civ. 6433, 2010 WL 334985 (S.D.N.Y. Jan. 29, 2010), in ruling that the 100 lot exemption applies as long as no more than 99 non-exempt lots are sold.  (Dkt. No. 20: Steiner Br. at 3, 11–12; Dkt. No. 23: Steiner Reply Br. at 4-5.)   In Bodansky, Judge Cote found that "[t]he plain meaning of the text [of 15 U.S.C. § 1702(b)(1)] is that as long as the 'subdivision' contains 'fewer than one hundred' non-exempt lots, then the Act's registration and disclosure requirements do not apply to the sale of lots in that subdivision."  Bodansky v. Fifth on the Park Condo, LLC,  2010 WL 334985 at *4.  Judge Cote held that the 100 lot exemption did not have to be satisfied at the time of the plaintiffs' purchase agreement, finding that nothing in § 1702(b)'s text required determination "at the time of sale of any particular lot."  Bodansky, 2010 WL 334985 at *4-5.  Therefore, Judge Cote concluded, "the Hundred Lot Exemption can still apply to a subdivision

---

[16]     Steiner could have availed itself of the 100 lot exemption if, in its contracts for the first 24 lots, it contracted to erect the building within two years, i.e., using the § 1702(a)(2) two year exemption along with the § 1702(b)(1) 100 lot exemption.  See, e.g., First Global Corp. v. Mansiana Ocean Residences, LLC, 2010 WL 2163756 at *2 ("[I]f a project consists of 123 units, a developer can sell 24 of the units  under an obligation to construct a building on the property within two years, i.e. qualifying for the two-year exemption, and the remaining 99 units would then qualify under the 100-lot exemption.").  Steiner, however, did not contract in the plaintiffs' Purchase Agreements to construct the building within two years.

containing one hundred or more lots as long as all lots sold <u>above</u> the ninety-nine non-exempt lots

maximum will be covered by a § 1702(a) exemption." <u>Bodansky</u>, 2010 WL 334985 at *4.

   This Court respectfully declines to follow <u>Bodansky</u>.<u>17/</u> Allowing a developer to rely

on the 100 lot exemption until it sells more than 99 non-exempt lots would significantly weaken

ILSA's disclosure and revocation protections.  ILSA gives a purchaser only two years from signing

the Purchase Agreement to revoke the sale based on the developer's failure to provide timely

disclosure of the property report.  15 U.S.C. § 1703(c).  If the developer refuses to return the

purchaser's money, the purchaser may "bring an action" to enforce ILSA's revocation rights, <u>see</u> 15

U.S.C. § 1709(b), "within three years" of signing the contract, 15 U.S.C. § 1711(b).   Under

<u>Bodansky</u>, however, the condominium would be exempt until the developer sold the 100th non-

exempt lot.  (<u>See</u> pages 14-15 above.)  If the developer did not sell the 100th lot until more than two

years after a purchaser had bought a lot, the purchaser would have lost ILSA's revocation right.  As

the <u>Rensin</u> court noted:

> [A] purchaser's rights to full disclosure of the rights of revocation and complete
> information in the form of the property report could be vitiated simply by a
> developers' stated (but unfulfilled) intention to later sell sufficient lots to builders,<u>18/</u>
> therefore bypassing Congress' intent to protect potential purchasers through
> pre-purchase disclosure.  For example, if a development contained 150 lots for sale
> and the developer claimed an intention to sell 51 lots to builders, the purchaser of the
> first lot, "Lot 1," would not be notified of his right of revocation with seven days (per
> § 1703(b)) or two years (per § 1703(c)), nor would purchaser be provided with the
> required property report <u>prior</u> to entering into the agreement (per §§ 1703(a)(1)(B),

---

<u>17/</u> As noted above, <u>Bodansky</u> is on appeal to the Second Circuit.

<u>18/</u> The sale of unimproved lots to builders is another § 1702(a) exemption, <u>see</u> 15 U.S.C.
§ 1702(a)(7), that, like the § 1702(a)(2) exemption for completed buildings or contractual
commitments to build within two years, can be stacked with the § 1702(b)(1) 100 lot
exemption.

> 1707). Three years later, if the developer had failed to sell any lots to builders and sold the 100th non-exempt lot to an individual homebuyer, the development would be subject to [ILSA]. The purchasers of the first 99 lots, however, would not have benefit[t]ed from the full disclosure and reporting requirements of the Act prior to purchasing their lots, nor would they have been able to exercise the rights of revocation that Congress intended to protect them. . . . This reading of the statute goes against its plain meaning as well Congress's clear intent to require developers to provide "full disclosure" of information to potential purchasers, submit a property report to HUD, and alert purchasers to their rights of revocation <u>prior</u> to the purchaser entering a purchase agreement.

<u>Rensin</u> v. <u>Juno-Loudon, LLC</u>, No. 09cv1391, 2010 WL 1381546 at *7 (E.D. Va. Mar. 30, 2010). In other words, instead of narrowly construing the 100 lot exemption, <u>Bodansky</u> enlarged it by allowing a developer, in certain circumstances, to render the purchaser unable to invoke ILSA revocation rights even where the property is no longer exempt.[19]

Additionally, <u>Bodansky</u> failed to address the 100 lot exemption's present tense language, instead noting that "the text does not specify the point in time at which the number of

---

[19]     Steiner argues that such a factual situation is not present before the Court and thus should not be a basis for the Court's decision.  (Steiner Br. at 16 n.5; Steiner Reply Br. at 5 n.3.) While Steiner did complete the building within two years, it was not contractually obligated to do so, and plaintiffs could have had their Purchase Agreements and deposits held by Steiner for years, with no revocation right, under Steiner's interpretation of the exemptions. Such a conclusion is not acceptable to this Court.  Moreover, Steiner's interpretation would appear to make the two year exemption totally superfluous.  Under Steiner's view of § 1702(a)-(b), a developer could sell 99 units and wait well beyond two years to complete the building and sell the 100th and subsequent units.  An interpretation that makes part of a statute superfluous should not be adopted by the Court.  <u>See</u>, <u>e.g.</u>, <u>APWU</u> v. <u>Potter</u>, 343 F.3d 619, 626 (2d Cir. 2003) ("'[A] basic tenet of statutory construction . . . [is] that [a text] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.'"); <u>State St. Bank & Trust Co.</u> v. <u>Salovaara</u>, 326 F.3d 130, 139 (2d Cir. 2003) ("It is well-settled that courts should avoid statutory interpretations that render provisions superfluous: 'It is our duty to give effect, if possible, to every clause and word of a statute.'" (quoting <u>Duncan</u> v. <u>Walker</u>, 533 U.S. 167, 174, 121 S. Ct. 2120, 2125 (2001)).

non-exempt lots 'contain[ed]' in a subdivision must be measured."  Bodansky v. Fifth on the Park Condo, LLC,  2010 WL 334985 at *5.  Bodansky's reading of the exemption is contrary to the statute's language, as discussed at pages 17-18 above.

   Steiner, however, argues that the present tense of the 100 lot exemption is insignificant since the Dictionary Act, 1 U.S.C. § 1, provides that "'[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] . . . words used in the present tense include the future as well as the present.'"  (Steiner Reply Br. at 5, quoting  1 U.S.C. § 1.)  After adding the future tense, the 100 lot exemption would apply to a subdivision that, at some future point, would contain less than 100 lots that are, or that will be, exempt under 15 U.S.C. § 1702(a).  Steiner argues that Bodansky "interpreted ILSA and its exemptions in precisely the manner dictated by the Dictionary Act and consist[ent] with the canons of statutory interpretation."  (Steiner Reply Br. at 5, fn. omitted.)

   This argument is unavailing.  In Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 113 S. Ct. 716 (1993), the Supreme Court explained the Dictionary Act's usage of the phrase "unless the context indicates otherwise":

> "Context" here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts, and this is simply an instance of the word's ordinary meaning: "[t]he part or parts of a discourse preceding or following a 'text' or passage or a word, or so intimately associated with it as to throw light upon its meaning." Webster's New International Dictionary 576 (2d ed. 1942). While "context" can carry a secondary meaning of "[a]ssociated surroundings, whether material or mental," ibid., we doubt that the broader sense applies here. The Dictionary Act uses "context" to give an instruction about how to "determin[e] the meaning of a[n] Act of Congress," a purpose suggesting the primary sense. If Congress had meant to point further afield, as to legislative history, for example, it would have been natural to use a more spacious phrase, like "evidence of congressional intent," in place of "context."

> If "context" thus has a narrow compass, the "indication" contemplated by 1 U.S.C. § 1 has a broader one. The Dictionary Act's very reference to contextual "indication" bespeaks something more than an express contrary definition, and courts would hardly need direction where Congress had thought to include an express, specialized definition for the purpose of a particular Act; ordinary rules of statutory construction would prefer the specific definition over the Dictionary Act's general one. Where a court needs help is in the awkward case where Congress provides no particular definition, but the definition in 1 U.S.C. § 1 seems not to fit. There it is that the qualification "unless the context indicates otherwise" has a real job to do, in excusing the court from forcing a square peg into a round hole.

Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. at 199-200, 113 S. Ct. at 720.  The Supreme Court also clarified that "'indicates' certainly imposes less of a burden than, say, 'requires' or 'necessitates,'" and that "this exception from the general rule would be superfluous if the context 'indicate[d] otherwise' only when use of the general definition would be incongruous enough to invoke the common mandate of statutory construction to avoid absurd results." Id. at 200, 113 S. Ct. at 720 (fn. omitted).

The text surrounding § 1702(b)(1)'s 100 lot exemption indicates that using the Dictionary Act to incorporate the future tense would be "forcing a square peg into a round hole." ILSA's registration and disclosure provisions impose duties that a developer must comply with before the purchaser signs the Purchase Agreement, and ILSA requires the Purchase Agreement to notify the purchaser of his revocation and other ILSA rights.  (See page 19 above.)  It is clear from these provisions that ILSA is protecting the purchaser at the time of the purchase, ensuring that the developer provides the purchaser with the information needed to make an informed purchase decision.  If the 100 lot exemption is read to allow future compliance, as in Bodansky, ILSA's disclosure requirements would no longer protect the purchaser at the time of the sale.

Additionally, including the future tense would allow a condominium to remain exempt as long as it is possible that, one day in the indefinite future, the condominium would contain less than 100 non-exempt units.  This reading of the exemption would vitiate ILSA's revocation rights which might expire before the one hundredth lot was sold.  (See pages 24-25 above.)

Moreover, Congress used express language when it intended that the availability of an ILSA exemption be determined at a time other than the purchase date.  See, e.g., 15 U.S.C. § 1702(b)(2) (exemption determined by how many lots will be sold within twelve months of first sale); 15 U.S.C. § 1702(b)(5)(c), (e) (exemption determined in part by whether, "at the time of closing," certain specified events have taken place).  Had Congress intended that the 100 lot exemption could be determined by future compliance, it would have expressly so stated.  See, e.g., Duncan v. Walker, 533 U.S. at 173, 121 S. Ct. at 2125 ("It is well settled that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"); accord, e.g., Bates v. United States, 522 U.S. 23, 29-30, 118 S. Ct. 285, 290 (1997); Smaldone v. Senkowski, 273 F.3d 133, 137 (2d Cir. 2001), cert. denied, 535 U.S. 1017, 122 S. Ct. 1606 (2002).

The Dictionary Act provisions do not apply to the 100 lot exemption since ILSA's exemptions, revocation and statute of limitations provisions indicate that the exemption only should apply to subdivisions that are exempt at the time of sale.  Since the 100 lot exemption is written in the present tense, this Court declines to follows Bodansky.

Moreover, according to Bodansky, the number of units being offered for sale at the time of the purchase is irrelevant in determining whether a subdivision contains fewer than one hundred non-exempt lots.  Bodansky v. Fifth on the Park Condo, LLC,  2010 WL 334985 at *4 ("Plaintiffs' argument that the Hundred Lot Exemption applies only if at the time a purchase agreement is signed, fewer than one hundred non-exempt lots are offered for sale in the subdivision is unsupported by the text of the statute.").  In calculating how many non-exempt lots are contained in a condominium, Bodansky considers only the amount of non-exempt units that have been sold. See Id. at *5 ("As long as a developer does not enter into contracts to sell more than ninety-nine non-exempt lots in the subdivision, it may take advantage of the Hundred Lot Exemption.").  If this is what Congress had intended, the exemption should have been drafted to exempt the sale of lots "in a subdivision where fewer than one hundred lots which are not exempt under subsection (a) have been sold."  By focusing on how many lots are "contained" in a subdivision, Congress made clear that it was counting all non-exempt lots in the subdivision, not only the ones that have been sold.

Bodansky also noted that its holding that the 100 lot exemption applies until the 100th non-exempt lot is sold "is consistent with the regulations issued by HUD pursuant to its authority to promulgate 'rules and regulations' under ILSA." Bodansky v. Fifth on the Park Condo, LLC, 2010 WL 334985 at *5 (quoting 15 U.S.C. § 1718).  Under HUD's  regulations, the 100 lot exemption is available "if, since April 28, 1969, the subdivision has contained fewer than 100 lots, exclusive of lots which are exempt from jurisdiction under § 1710.5." 24 C.F.R. § 1710.6.[20] Bodansky noted that, "[l]ike the statutory text on which it is based, [this HUD regulation] contains

---

[20]      24 C.F.R. § 1710.5 references a "listing of the statutory exemptions" under ILSA.

no requirement that the determination of which units in a condominium 'are exempt from jurisdiction under § 1710.5' occur at the time of sale of a particular lot."  Bodansky, 2010 WL 334985 at *5.  Bodansky interpreted this HUD regulation to allow a developer to rely on the 100 lot exemption for "as long as the development contains fewer than one hundred non-exempt units, i.e., units sold prior to completion."   Bodansky, 2010 WL 334985 at *5.[21/]

       When faced with an administrative agency's interpretation of a statute, the Supreme Court has provided a two-step process for reviewing the agency's construction of the statute.  See, e.g., Chevron U.S.A. Inc., v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82 (1984).  The first step is to determine whether Congressional intent is clear.  Id. at 842, 104 S. Ct. at 2781.  "If the intent of Congress is clear, that is then end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43, 104 S. Ct. at 2781.  If Congressional intent is ambiguous, the second step is to determine if the agency's regulations are "arbitrary, capricious, or manifestly contrary to the statute."  Id. at 844, 104 S. Ct. at 2782.

---

[21/]    Bodansky further noted that its holding is supported by that fact that, under HUD regulations, "a developer's eligibility for exemptions under ILSA is 'self-determining.'"  Bodansky, 2010 WL 334985 at *6.  Pursuant to HUD's regulations, "a developer is not required to file notice with or obtain the approval of the Secretary in order to take advantage of an exemption."  24 C.F.R. § 1710.4(d).  Rather, "[i]f a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met."  24 C.F.R. § 1710.4(d).  It is hard to see how this regulation supports Bodansky's holding, however, since it provides only that a developer does not need HUD's pre-approval before using an exemption.  This would be true whether the exemption is determined at the time of the sale or at some future point.

As discussed in Section II.B. above, in this Court's opinion, Congress' intent is clear from the 100 lot exemption's unambiguous language:  the exemption applies only if, at the time of the sale, the subdivision contains fewer than one hundred non-exempt lots.  To the extent HUD's regulations imply otherwise, no deference is required.  See, e.g., Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600, 124 S. Ct. 1236, 1248 (2004) ("Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."); Chevron U.S.A. Inc., v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9, 104 S. Ct. at 2781 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").[22]

---

[22]   Bodansky also cited to HUD's interpretive guidelines in further support of its holding.  See Bodansky, 2010 WL 334985 at *6-7.  To the extent these guidelines allow a developer to rely on the 100 lot exemption until more than 99 non-exempt lots are sold, no deference is required since, as noted in the text above, this interpretation conflicts with Congress' intent.

32

## CONCLUSION

For the reasons stated above, plaintiffs' summary judgment motion (Dkt. No. 15) is

<u>GRANTED</u> and Steiner's summary judgment motion (Dkt. No. 18) is <u>DENIED</u>.

            SO ORDERED.

DATED:       New York, New York
               December 3, 2010

                                                      **Andrew J. Peck**
                                                  United States Magistrate Judge

Copies to:    Philip R. Schatz, Esq.
                  Andrea L. Roschelle, Esq.

H:\OPIN\GRIFFITH